FILED
JAN 2 4 2011

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

DAVID LAMONT,

                    Plaintiff,

v.

ANNING-JOHNSON CO.,

                    Defendant.

CV.09-1391-PK

FINDINGS AND
RECOMMENDATION

PAPAK, Magistrate Judge:

Plaintiff David Lamont filed claims against defendant Anning-Johnson Co, alleging age

discrimination in violation of the Age Discrimination and Employment Act (ADEA), 29 U.S.C. §

623(a)(1), and O.R.S. 659A.030(1)(b); racial discrimination in violation of Title VII, 42 U.S.C. §

2000e-2(m), 42 U.S.C. § 1981(c), and O.R.S. 659A.030(1)(b); retaliation for opposing unlawful

employment practices in violation of O.R.S. 659A.030(1)(f), and for violation of social policy, in

Page 1 - FINDINGS AND RECOMMENDATION

violation of O.R.S. 654.062(5)(a). The court has original subject matter jurisdiction over

Lamont's Title VII and ADEA claims, 28 U.S.C. § 1331, and supplemental jurisdiction over his

state law claims, 28 U.S.C. § 1367.

Presently before the court is defendant's motion for summary judgment. For the reasons

discussed below, the motion should be granted in part and denied in part.

## LEGAL STANDARD

Summary judgment is appropriate "if the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if any, show that there is no

genuine issue as to any material fact and that the moving party is entitled to a judgment as a

matter of law." Fed.R.Civ.P. 56(c). Summary judgment is not proper if material factual issues

exist for trial. *See, e.g., Celotex Corp. v. Catrett,* 477 U.S. 318, 322 (1986); *Anderson v. Liberty

Lobby, Inc.,* 477 U.S. 242, 248 (1986); *Warren v. City of Carlsbad,* 58 F.3d 439, 441 (9th Cir.

1995), *cert. denied,* 516 U.S. 1171 (1996). In evaluating a motion for summary judgment, the

district courts of the United States must draw all reasonable inferences in favor of the nonmoving

party, and may neither make credibility determinations nor perform any weighing of the

evidence. *See, e.g., Lytle v. Household Mfg., Inc.,* 494 U.S. 545, 554-55 (1990); *Reeves v.

Sanderson Plumbing Products, Inc.,* 530 U.S. 133, 150 (2000).

The substantive law governing a claim or defense determines whether a fact is material.

*T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n,* 809 F.2d 626, 630 (9th Cir.1987). The

court must view the inferences drawn from the facts "in the light most favorable to the

nonmoving party." *Id.* (citation omitted). In employment discrimination cases "very little

evidence" is required to survive summary judgment "because the ultimate question is one that

Page 2 - FINDINGS AND RECOMMENDATION

can only be resolved through a searching inquiry-one that is appropriately conducted by the fact

finder upon a full record." *Schnidrig v. Columbia Mach.,* 80 F.3d 1406, 1410 (9th Cir.) (internal

quotations, citation omitted), *cert denied,* 519 U.S. 927 (1996).

## BACKGROUND

Anning-Johnson is a drywall contractor that employs framers, carpenters and tapers to

perform various parts of drywall construction projects. (Lamont Depo.[1] at pp. 16-17; Gauthier

Decl. (#20) at ¶ 3.) Typically, Anning-Johnson serves as a subcontractor to a general contractor

on construction projects. (Lamont Depo. at p. 22; Gauthier Decl. at ¶ 3.) Anning-Johnson hired

Lamont in May 2005 as a drywall taper journeyman. (Lamont Depo. at p. 15; Gauthier Decl. at ¶

4.) Taping Superintendent John Gauthier hired plaintiff and was his immediate supervisor.

(Lamont Depo. at p. 14, 20; Gauthier Decl. at ¶ 4.) Above Gauthier in the supervisory chain was

Construction Manager Carl Philliber and District Manager Jason Roach. (Lamont Depo. at pp.

43-44.) All of Anning-Johnson's drywall tapers work under a collective bargaining agreement

between Anning-Johnson and the Painters and Allied Trades International Union. (Gauthier

Decl. at ¶ 5, Ex. 1.)

In March 2008, Lamont was promoted from journeyman to foreman; a few weeks later he

was upgraded from foreman pay to designated foreman pay. (Lamont Depo. at pp. 19-20, 46-47;

Gauthier Decl. at ¶ 6.) According to the terms of the collective bargaining agreement, a foreman

receives pay 5% above the journeyman base rate, and a designated foreman receives an

---

[1] Both parties have submitted documents with various attachments, including multiple excerpts of depositions, attached to different documents. Unless otherwise indicated, all of the citations are directly to the authenticating depositions, not to the documents to which they are attached.

additional 5%, for a total of 10% more than the journeyman base pay rate. (Gauthier Decl., Ex.

1, p. 2.) A person may be assigned designated foreman status either by way of satisfactory

completion of supervisory training or by employer designation. (*Id.*)

        As a taping foreman, Lamont ensured the completion of taping work, directed

journeyman and apprentice tapers, performed physical work himself, and turned in daily and

weekly reports such as time cards, work orders, safety meetings, and daily logs documenting

problems on site. (Lamont Depo. at pp. 21, 24-26, 29-31.) At some point, foremen were asked

to indicate on time cards when crew members did not show up to work, but were not required to

keep a written log on individual employees on a regular basis. (*Id.* at p. 34.) When a foreman

felt there was an issue with a member of the crew, he would ask Gauthier for help, and if the

issue was serious, the crew member could be laid off. (*Id.*) Lamont testified that he thought

work quality, pace, and on larger jobs, the ability to work on a team, were important qualities for

crew members to possess. (*Id.* at pp. 26-27.) At some point during a job, there would come a

time when Anning-Johnson would have to start reducing the number of people working on a

crew. (*Id.* at pp. 37-38.) Depending on what kind of work was left, foremen might make

recommendations to Gauthier, taking into account the taper's work quality, pace, tidiness, and

attendance. (*Id.* at pp. 38-40.)

        In September 2008, Lamont worked as a foreman at a project known as "Tanasbourne,"

for which Anderson Construction was the general contractor. (*Id.* at p. 55, 57, 62.) After two

days of work, Lamont was removed from the job site because one of the Anderson

superintendents, Jeff Stokes, believed Lamont was not satisfactorily completing his work and had

left the job site without permission. (*Id.* at pp. 57-60; Gauthier Depo. at p. 11.) Lamont sought

Page 4 - FINDINGS AND RECOMMENDATION

to explain to Stokes that he left the job site in order to accomplish other foreman duties and that

he was unaware that he should ask the general contractor's superintendent for permission, since

he had not had to do so at any other job site. (Lamont Depo. at pp. 59-60.) Gauthier did not

allow Lamont to attempt to smooth things out with Stokes and removed him from the site. (*Id*.)

Shortly thereafter, Lamont worked as a journeyman on another Anderson job site called

"Toke America." (*Id*. at pp. 66-67, 72-73.) Lamont worked on this site for only a couple of days

because he experienced trouble with fumes coming from a flooring epoxy in the room next to the

one in which he was working. (*Id*. at pp. 73-76; Gauthier Depo. at p. 43.) The fumes gave

Lamont a headache on the morning of his first day on the job, so he reported this to his taping

foreman, Randy Johnson, and asked him to go out to the Anderson trailer and retrieve the

materials data safety sheet ("MSDS") book so that he could look up what chemicals were being

used. (*Id*. at pp. 73-75.) When Johnson did not immediately retrieve the MSDS, Lamont called

Gauthier and requested a respirator, which was denied because Anning-Johnson had not test

fitted him, as required by the union contract. (*Id*. at pp. 75-79.) Lamont was angered by this.

(*Id*.) The same day, hanging foreman Alex Gonzalez and hanging superintendent Nick Irwin also

made unsuccessful attempts to retrieve the MSDS book. (*Id*. at pp. 80-82.)

The next day, about an hour after reporting to the Toke America job site, Lamont

received a phone call from Gauthier telling him that Philliber wanted him off the job site

immediately. (*Id*. at pp. 83-84). Philliber had heard from Gonzales and Irwin that Lamont had

requested the MSDS book and that he was "raising a stink." (Philliber Depo. at p. 28.) Gauthier

asked Lamont whether he had spoken to anyone from Anderson about the chemicals, and when

Lamont responded that he had not, Gauthier told him that Philliber had heard that he had made a

Page 5 - FINDINGS AND RECOMMENDATION

"stink" the previous day about how he felt the chemicals were harmful. (Lamont Depo. at pp.

82-85.) After Gauthier hung up the phone, Lamont immediately left the job site. (*Id*. at p. 84.)

That same day, Lamont wrote a letter to District Manager Roach about the fumes and

MSDS issue and placed it in his mailbox. (Lamont Depo. at p. 93; Roach Depo. at pp. 21-22.)

Roach made efforts to retrieve the MSDS and met with Lamont about a month later to discuss

the issue. (Lamont Depo. at pp. 99-100, 104; Roach Depo. at pp. 22-25.) On the weekend,

Lamont called Gauthier and told him about the letter he wrote to Roach, to which Gauthier

responded that he was "kind of upset." (Lamont Depo. at. pp. 88-89.) They also discussed

OSHA's rules regarding chemical safety issues and the sequence of events on the job site, to

which Gauthier was "very nice and agreeable," and apologized for "lack of response." *Id*. at pp.

90-91.) Lamont never received a copy of the MSDS. (*Id*. at pp. 96, 99-100.)

Lamont lost no pay and was immediately reassigned to a new project the following

Monday. (*Id*. at  pp. 89-90). For the next two to three weeks, Lamont worked as foreman on a

couple of small jobs, eventually ending up at the "Ladd Tower" job site as a journeyman, but

receiving foreman pay. (*Id*. at pp. 67-69, 115-16; Gauthier Decl. at ¶ 7.) Because there were no

foreman positions available, Lamont acknowledges that Anning-Johnson could have instead

placed Lamont on layoff status. (*Id*. at p.116.)

Taping foreman Shaun Hart oversaw all the tapers at Ladd, although the tapers were

assigned to multiple crews. (*Id*. at pp. 106, 108, 110-11.) Taping foreman Santiago Recinos ran

one of the crews at Ladd Tower, which worked on the high-rise units themselves. (*Id*. at pp. 106-

08.). Recinos and his crew were all Hispanic. (*Id*. at pp. 106-108, 113-14 144.) Lamont worked

as part of the "second" and "third" crews, run by different foremen at different times, doing

Page 6 - FINDINGS AND RECOMMENDATION

various finish work around the job site. (*Id.* at pp. 107-115.) Hart kept a list of people on-site. (*Id.* at p. 121.) Lamont generally worked from 7:00 a.m. to 3:30 p.m., and needed permission from Hart to leave early. (*Id.* at p. 121.) On two occasions, Lamont left work early, receiving permission from Hart in advance. (*Id.* at pp. 121-22; Hart Depo. at pp. 17, 20.) Because of diminishing workload at Ladd Tower, several members of Lamont's work crew were laid off, including three younger employees, two of whom were Hispanic. (Lamont Depo. at pp. 117-120, 123-25.)

While Lamont was working at Ladd Tower, Hart periodically spoke with Gauthier about problems he was having with Lamont. (Gauthier Decl. at ¶ 8; Hart Decl. (# 21) at ¶¶ 6-7.) Hart reported that Lamont had irregular attendance, that he sometimes left work early without permission, disappeared for extended periods during the work day, and was occasionally a no-call/no-show for the entire day. (*Id.*) Hart also expressed concerns about Lamont's ability to contribute to the team because he would sometimes decline to perform certain tasks that are central to a taper's job, such as sanding. (*Id.*; Hart Depo. at pp. 34-35.) Gauthier would periodically tour the Ladd Tower site during normal working hours, and noticed that Lamont was sometimes missing from his assigned work area and sometimes appeared to be missing from the job site altogether. (*Id.*; Gauthier Depo. at p. 36.) Gauthier passed this information on to Philliber. (Gauthier Decl. at ¶¶ 8-9.)

Because of diminishing workload at Ladd Tower, additional layoffs became necessary in mid-January 2009. (*Id.* at ¶10.) Based on what Gauthier had learned from Hart about Lamont's sporadic attendance and lack of teamwork, and based on his own observations at the work site, Gauthier and Philliber decided to select plaintiff for layoff. (*Id.* at ¶¶ 11-13.) Philliber also

Page 7 - FINDINGS AND RECOMMENDATION

considered what Anderson superintendent Stokes had told him about Lamont's attendance and performance problems on the Tanasbourne site. (Philliber Decl. (# 22), at ¶¶ 5-7.) Roach approved the decision. (Roach Depo. at pp. 11-12.) Gauthier directed Hart to inform Lamont of the layoff, and Hart left a voice mail to that effect on January 15, 2009. (Lamont Depo. at pp. 124-25; Gauthier Decl. at ¶ 14.) Lamont did not receive the message until the next morning. (*Id.*)

After hearing the message, Lamont called Hart because he could not reach Gauthier. (Lamont Depo. at pp. 126, 130-31.) According to Lamont, Hart told him that Gauthier had come to the Ladd Tower work site the previous afternoon and asked questions about where Lamont was. (*Id.* at pp. 126-28.) Lamont also testified that Hart apologized for failing to mention to Gauthier that he had approved Lamont's request to leave the site early that day. (*Id.*)

On the morning of January 16, 2009, Gauthier returned Lamont's call and discussed the reasons why Lamont had been laid off. (*Id.* at pp. 131-32.) Gauthier explained that they were running out of work on the project and that the crews were being combined into one. (*Id.*) When Lamont requested to be placed on Recinos' crew, Gauthier responded that he could not break the crew up because of the crew's high work volume and productivity. (*Id.* at pp. 132-35; Gauthier Depo. at pp. 25-27; Gauthier Decl. at ¶ 16.) Gauthier indicated that he thought the layoff would last at least a week. (Lamont Depo. at p. 135.)

After speaking to Gauthier, Lamont called Carol Flynn in the corporate office, after finding her phone number in an employee handbook section, about harassment and discrimination. (*Id.* at pp. 135-37.) Flynn is Anning-Johnson's Corporate Safety Officer, but on the day that Lamont called, she was temporarily filling in for someone in Human Resources.

Page 8 - FINDINGS AND RECOMMENDATION

(Gauthier Depo. at p. 22.)  Lamont told Flynn that he believed that he was being discriminated

against because he was "old and white." (Lamont Depo. at pp. 137-38.)  According to Lamont,

Flynn responded that his complaints did not sound like harassment to her, but just a layoff, and

that "whites being laid off and Mexicans being hired was kind of standard practice in

construction in general."  (*Id*. at p. 138-40.)

Later that afternoon, Lamont received a phone call from Philliber and Roach.  (*Id*. at p.

145.)  Flynn had called Philliber to report Lamont's complaint and suggested that he talk to

Lamont. (Philliber Depo. at pp. 15-18.)  According to Lamont, Philliber was "badgering" him

about why he had called corporate rather than talking to Roach about his allegations.  (Lamont

Depo. at pp. 145-51.)  Lamont explained that he did not have a chance to join Recinos' crew and

tried to talk about his previous MSDS complaint, but Philliber cut him off.  (*Id*.)  According to

Philliber, he tried to "reason with" Lamont about the reason for his layoff, telling him that he was

laid off for performance reasons, not because of his race, age, or seniority.  (Philliber Depo. at p.

19.)

Within an hour of the conversation with Philliber and Roach, Lamont's company-issued

cell phone was turned off.  (Lamont Depo. at pp. 151-52.)  Philliber and Gauthier were in charge

of contacting someone to turn off company-issued cell phones.  (Philliber Depo. at p. 23;

Gauthier Depo. at p. 15-16.)  Anning-Johnson does not have an established practice, policy, or

procedure for turning off service to employee's cell phones, but sometimes the company will

deactivate company-issued cell phones as a cost-saving measure when the phones are not

anticipated to be used for a period of time. (Roach Decl. (#19) at ¶ 5.)  The company often takes

into consideration whether the employee would be put into a foreman's position again and

Page 9 - FINDINGS AND RECOMMENDATION

whether there is a job coming up for them to run. (Philliber Depo. at p. 23; Gauthier Depo. at pp. 15-16.) Philliber testified that "there would be no reason" for an employee to have a cell phone if they were not expected to come back for awhile, and that he did not expect Lamont to come back as a foreman in the near future. (Philliber Depo. at p. 24.)

Because of Philliber's tone of voice during the January 16, 2009, conversation and because his phone was turned off almost immediately thereafter, Lamont was left with the impression that he had been discharged, even though nobody at Anning-Johnson ever communicated this to him, either verbally or in writing. (Lamont Depo. at pp. 152-54.) Nobody at Anning-Johnson has requested that Lamont return his company-issued cell phone. (*Id.* at pp. 125, 149, 154-58.) Lamont had been previously laid off for five to six weeks in 2006-2007 and had not had his phone turned off. (*Id.* at pp. 70, 152.) According to the terms of the collective bargaining agreement, an employee may be discharged for "just and sufficient cause," but the employer must issue a "no rehire" slip to the local union. (*Id.* at pp. 206-207, Ex. 25, p. 4.) Anning-Johnson never issued a "no rehire" slip. (Gauthier Decl. at ¶¶ 5, 15, Ex. 1.)

Since January 16, 2008, Lamont has not made any efforts to be recalled or rehired by Anning-Johnson. (Lamont Depo. at p. 158; Gauthier Depo. at p. 19.) Philliber acknowledged that when a taper is laid off for poor performance, they would not be "at the top of the list" for recall, but that Anning-Johnson would still have contact with the person, to the extent that it is initiated by the person that wants to come back to work. (Philliber Depo. at p. 25.) While the business "fluctuates quite a bit," Anning-Johnson encourages tapers to "stay in contact" once they have called in seeking work, but that they "don't call guys unless they stay in contact." (*Id.*) Gauthier admits that he has, on occasion, called foremen when he has foreman work available

Page 10 - FINDINGS AND RECOMMENDATION

and he knows that they are "at home waiting for a job to start." (Gauthier Depo. at pp. 21-21.) At the time of Lamont's layoff, Gauthier thought Lamont would be back at work in a couple weeks, but only in a finisher role, not as a supervisor. (*Id.* at pp. 17-18.) Gauthier has not affirmatively contacted Lamont for work because he has had requests from certain carpentry foremen that Lamont not be assigned to their jobs, and because he believes other foremen have superior performance for the limited work that has been available since Lamont's layoff. (Gauthier Decl. at ¶¶ 17-18.) According to Anning-Johnson, Lamont remains in a layoff status, eligible for recall. (Philliber Decl. at ¶ 8.)

Despite the existence of a union grievance procedure, Lamont did not file a grievance before the time limit for filing had passed. (Lamont Depo. at pp. 169-71; Gauthier Decl., Ex. 1, p. 19.) He learned that the time had passed when he spoke to a union representative about his EEOC complaint a few months later. (Lamont Depo. at pp. 170-71.) Lamont originally filed this action on October 22, 2009, in Multnomah County Circuit Court as Case No. 0910-14848. (Notice of Removal (#1), at ¶ 3.) On November 19, 2009, Anning-Johnson timely removed to this court. (*Id.*)

## ANALYSIS

Lamont brings several claims for disparate treatment and retaliation under various provisions of federal and Oregon law. Lamont alleges disparate treatment based on his age and race, and claims for retaliatory discharge because he made a complaint of age and race discrimination and a complaint related to safe working conditions. Anning-Johnson seeks summary judgment on all claims because the undisputed facts make clear that Lamont cannot establish a *prima facie* case of discrimination or retaliation.

## I. Legal Framework

Lamont alleges claims for disparate treatment on account of his age and race under Title VII, §1981, ADEA, and Oregon law.  Courts apply the same *prima facie* standard to federal and state claims for disparate treatment, including claims arising under §1981 and the ADEA.  *See Henderson v. Jantzen, Inc.,* 79 Or.App. 654, 657, 719 P.2d 1322 (1986) (adopting U.S. Supreme Court's formulation of *prima facie* case); *Rose v. Wells Fargo & Co.*, 902 F.2d 1417, 1420 (9th Cir. 1990) ("The shifting burden of proof applied to at Title VII discrimination claim also applies to claims arising under ADEA."); *Gay v. Waiders' & Dairy Lunchmen's Union Local No. 30,* 694 F.2d 531, 539 (9th Cir. 1982) (adopting Title VII's disparate treatment *prima facie* standard for employment discrimination claims brought under § 1981).

The plaintiff carries the initial burden to establish a *prima facie* case of discrimination. *Lindahl v. Air France,* 930 F.2d 1434, 1437 (9th Cir.1991) (citing *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802 (1973)).  To meet that burden, the plaintiff must offer evidence that gives rise to an inference of unlawful discrimination, either through the framework set forth in *McDonnell Douglas* or with direct evidence of discriminatory intent.  *Vasquez v. County of Los Angeles,* 349 F.3d 634, 640 (9th Cir. 2003) (citation omitted).  The requisite degree of proof necessary for a plaintiff to establish a *prima facie* case on summary judgment "is minimal and does not even need to rise to the level of a preponderance of the evidence." *Wallis v. J.R. Simplot Co.*, 26 F.3d 885, 889 (9th Cir. 1994) (citation omitted).

Direct evidence of discrimination is "evidence of conduct or statements by persons involved in the decision-making process that may be viewed as directly reflecting the alleged discriminatory attitude sufficient to permit the fact finder to infer that the attitude was more

likely than not a motivating factor in the employer's decision." *Enlow v. Salem-Keizer Yellow Cab Co.*, 389 F.3d 802, 812 (9th Cir. 2004), *cert. denied*, 544 U.S. 974 (2005) "Direct evidence is 'evidence which, if believed, proves the fact of discriminatory animus without inference or presumption.' " *Vasquez*, 349 F.3d at 634 (quoting *Godwin v. Hunt Wesson, Inc.*, 150 F.3d 1217, 1221 (9th Cir. 1998)).

Under *McDonnell Douglas*, a plaintiff alleging disparate treatment under Title VII must show that: (1) he belongs to a protected class; (2) he was qualified for the position; (3) he was subject to an adverse employment action; and (4) similarly situated individuals outside his protected class were treated more favorably. *Chuang v. Univ. of California Davis*, 225 F.3d 1115, 1123 (9th Cir. 2000) (internal citation omitted). Once a plaintiff has made his *prima facie* showing of discrimination, "[t]he burden then must shift to the employer to articulate some legitimate, nondiscriminatory reason for the employee's rejection." *McDonnell Douglas*, 411 U.S. at 802. The employer "need not prove the absence of retaliatory intent or motive; it simply must produce evidence sufficient to dispel the inference of retaliation raised by the plaintiff." *Cohen v. Fred Meyer Inc.*, 686 F.2d 793, 796 (9th Cir. 1982) (citations omitted). This is merely a burden of production as the ultimate burden of persuasion remains with Lamont at all times. *Id*. at 796-97.

If the defendant successfully gives such a reason for the employment action, the plaintiff must then demonstrate that the proffered reason is pretextual. *Chuang*, 225 F.3d at 1124. Pretext may be established in one of two ways: "(1) indirectly by showing that defendant's proffered explanation is 'unworthy of credence' because it is internally inconsistent or otherwise not believable; or (2) directly, by showing that unlawful discrimination more likely motivated the

Page 13 - FINDINGS AND RECOMMENDATION

employer." *Id.* at 1127. "When that evidence, direct or circumstantial *consists of more* than the [*prima facie*] presumption, a factual question will almost always exist with respect to any claim of nondiscriminatory reason[,]" but "in those cases where the *prima facie* case consists of no more than the minimum necessary to create a presumption of discrimination . . . , plaintiff has failed to raise a triable issue of fact." *Wallis*, 26 F3.d at 890 (internal quotations, citation omitted) (emphasis and brackets in original). That is, Lamont must do more than simply "establish a *prima facie* case and deny the credibility of [Anning-Johnson's] witnesses." *Id.* (citation omitted).

## II. Age and Race Discrimination Claims

### A. *Prima Facie* Case

#### 1. Direct Evidence

Lamont presents two arguments in support of his claim that he has direct evidence sufficient to establish a *prima facie* case of age and race discrimination. First, Lamont points to the fact that Anning-Johnson did not layoff anyone on Recinos' mostly younger[2] Hispanic crew prior to laying him off. Second, he refers to comments made by management in response to his complaints. Presumably, Lamont is referring to Flynn's response to his complaint, wherein Flynn stated that she did not think that he was being harassed, but merely laid off, and that "whites being laid off and Mexicans being hired was kind of standard practice in construction in general." (Lamont Depo. at pp. 138-40.)

Lamont's first argument requires an inference in order to establish discriminatory animus,

---

[2] The parties dispute whether all the members of Recinos' crew were indeed significantly younger than Lamont. This fact is not material however, because Anning-Johnson has presented evidence that at least some were younger than Lamont. (Roach Decl. at ¶ 4, Ex. 4.)

and thus does not establish a *prima facie* case of age and race discrimination by way of direct evidence. *See Vasquez*, 349 F.3d at 640. Lamont's argument that he was laid off because of his age or race is belied by his own deposition testimony, wherein he admits that Anning-Johnson laid off at least three younger workers at Ladd Tower before laying off Lamont, two of whom were Hispanic. (Lamont Depo. at. pp. 117-120, 123-25). Therefore, Lamont's reference to the fact that no workers from Recinos' all-Hispanic, mostly younger, crew were laid off before he was, is at most, circumstantial evidence of discrimination.

With regard to Lamont's second argument regarding Flynn's statement, the record is clear that the statement was a general assertion not specifically directed at Lamont and made on a single occasion by someone with no decision-making authority over layoff or recall decisions. "The Ninth Circuit has held a 'stray remark' that is 'uttered in an ambivalent manner and [is] not tied directly to [the plaintiff]'s termination is insufficient to create an inference of discriminatory motive.'" *Hartung v. Cae Newnes, Inc.*, 229 F.Supp.2d 1093, 1100 (D. Or. 2002) (quoting *Merrick v. Farmers Ins. Group*, 892 F.2d 1434, 1438-39 (9th Cir. 1990). However, the Ninth Circuit has held that when a comment is sufficiently egregious, even if made just once, it falls outside the realm of stray remarks. *See Chuang*, 225 F.3d at 1128 (finding that decision-maker's laughter after an employee remarked that "two Chinks" in the department was more than enough constituted adequate direct evidence of discriminatory intent on the part of the decision-maker even though the remark did not refer to the plaintiff and did not relate to the employment decision at issue); *Cordova v. State Farm Ins. Cos.*, 124 F.3d 1145, 1149 (9th Cir. 1997) (decision-maker's comment that a coworker was a "dumb Mexican" and hired because he was a minority was sufficiently egregious to constitute discriminatory animus on the basis of national

origin even though the remark was not about the plaintiff or the underlying employment decision).

Here, while Flynn's remark is distasteful, it is not sufficiently egregious to establish that discriminatory animus motivated the employment action. Moreover, Lamont admits that while Flynn did have human resource responsibilities, she had no decision-making authority regarding any layoff or recall decisions. Generally, statements by nondecision-makers such as Flynn are not direct evidence of discriminatory intent. *Enlow*, 389 F.3d at 812. Lamont has not presented evidence that the remark was anything other than a single, isolated, off-hand comment unrelated to the decision-making process. Thus, While Flynn's statement is in poor taste, without more, it is not enough to allow a fact finder to conclude that Anning-Johnson was motivated by age or racial animus because it was "an isolated comment made by a person with no connection to the employment decision[.]" *Hartung*, 229 F.Supp.2d at 1100. At best, the statement is circumstantial evidence of discriminatory animus.

Accordingly, Lamont has failed to support his claim with direct evidence and will have to establish his *prima facie* case by way of the *McDonnell Douglas* burden-shifting framework.

### 2. *McDonnell Douglas*

Under *McDonnell Douglas*, Lamont must show that: (1) he belongs to a protected class; (2) he was qualified for the position; (3) he was subject to an adverse employment action; and (4) similarly situated individuals outside his protected class were treated more favorably. *Chuang*, 225 F.3d at 1123. For purposes of summary judgment, Anning-Johnson takes issue only with the final element, that Lamont was treated differently than a similarly situated employee who does

not belong to the same protected class.[3]

In order to show that the employees allegedly receiving more favorable treatment are similarly situated, the plaintiff must establish, at the least, that he is similarly situated to those employees in all material respects. *Moran v. Selig*, 447 F.3d 748, 755 (9th Cir. 2006). The court notes that evidence required to "clear the . . . *prima facie* bar" is minimal. *Aragon v. Republic Silver State Disposal, Inc.*, 292 F.3d 654, 660 (9th Cir. 2002). Lamont must show that his "lay off occurred under circumstances giving rise to an inference of discrimination." *Id.* (quoting *Coleman v. Quaker Oats Co.*, 232 F.3d 1271, 1281 (9th Cir. 2000), *cert denied*, 533 U.S. 950 (2001) (citation and quotation marks omitted)). "[T]his inference can be established by showing the employer had a continuing need for [Lamont's] skills and services in that [Lamont's] various duties were still being performed, or by showing that others not in [Lamont's] protected class were treated more favorably." *Id.* (citation and quotation marks omitted).

While this is a close call, Lamont has presented evidence that no workers from Recinos' all-Hispanic, mostly younger crew were laid off before he was laid off, despite the continued need for taping skills and services. The record is clear that the Ladd Tower job was winding down, the need for journeymen was decreasing, and the three crews were being merged into one, thereby necessitating some layoffs. (Gauthier Decl. at ¶ 10.) However, the record is also clear that the duties performed by Lamont were still being performed at Ladd Tower. Lamont's testimony indicates that while the work was slowing down on the building, Gauthier told him

---

[3] The parties vigorously dispute whether Lamont was laid off or discharged. The court need not resolve this issue for purposes of this motion because in order to establish a *prima facie* case for discrimination and retaliation, Lamont need only establish that he was subject to an "adverse employment action." Neither party disputes that regardless of what you call it, being laid off or discharged constitutes an adverse employment action.

Page 17 - FINDINGS AND RECOMMENDATION

that Recinos' crew, which included journeymen tapers[4] would not be broken up. (*Id.* at ¶ 16; Gauthier Depo. at pp. 25-27; Lamont Depo. at pp. 132-35.) While discriminatory animus is not the only inference that can be drawn, the court finds that Lamont has satisfied the minimal burden necessary to establish his *prima facie* case at this stage in the analysis.

### B. Employer Justification

Since Lamont has established a *prima facie* case, Anning-Johnson must articulate a legitimate non-discriminatory reason for the adverse employment action. Anning-Johnson has asserted two such reasons: (1) as work diminished at the Ladd Tower, layoffs became necessary; and (2) Lamont was selected for layoff because of his poor performance and attendance relative to others.

Anning-Johnson has established that the nature of construction work is that as the project nears completion, layoffs become necessary, with work picking back up as jobs become available. (Lamont Depo. at pp. 26-27; Philliber Depo. at p. 15; Philliber Decl. at ¶ 6.) At the time of Lamont's layoff, there was not much work available because there was an overall downturn in the construction business in the Portland metropolitan area, making it difficult to estimate when another job would come along. (Gauthier Decl. at ¶ 7.) At the time of the layoff, Gauthier told Lamont that he expected this layoff to last at least one week. (Lamont Depo. at p. 135.)

---

[4] The court acknowledges that Lamont was being paid a taping foreman's salary for performing journeyman work, and that Lamont has not demonstrated that there were any members of Recinos' crew that were in this same position. However, given the minimal bar that Lamont must clear at this stage, the court will evaluate his skills and services as those he was actually performing on the Ladd Tower job, which by all accounts, were those of a journeyman, despite his classification as a foreman.

Second, the record establishes that Gauthier and Philliber believed Lamont's job performance and attendance to be less than stellar. During the time Lamont was at Ladd Tower, Hart reported to Gauthier that he had been having attendance and performance issues with Lamont, including that he had irregular attendance, sometimes left early without permission, disappeared for extended periods throughout the work day, and was occasionally a no-call/no-show. (Gauthier Decl., at ¶ 8; Hart Decl. at ¶¶ 6-7.) Gauthier himself noticed when he would periodically tour the Ladd Tower job site, that sometimes Lamont was missing from his assigned work area and sometimes appeared missing from the job site altogether. (Gauthier Depo. at p. 36.) Gauthier and Hart each testified that they had received requests from other foreman and supervisors, both in and outside of Anning-Johnson, not to work with Lamont on projects, because they thought Lamont did not "pull his own weight" and was lazy. (Gauthier Depo. at pp. 11, 13; Gauthier Decl. at ¶17; Hart Depo. at pp. 33-35.)

According to Anning-Johnson, these two reasons are what led to Lamont's layoff. Both are legitimate, non-discriminatory justifications.

## C. Pretext

Because Anning-Johnson has produced legitimate justifications for the adverse employment action, the burden now shifts back to Lamont to put forth specific and substantial evidence that Anning-Johnson's reasons are really a pretext for discrimination. Lamont advances three arguments to demonstrate that Anning-Johnson's reasons for laying him off were pretextual: (1) Lamont was not disciplined for any of the action that Anning-Johnson now asserts is the reason for his lay off; (2) Lamont was unable to address any of the alleged issues during his employment; and (3) Anning-Johnson's ignored its own disciplinary policies.

Each of Lamont's purported reasons are intertwined. Essentially, Lamont argues that Anning-Johnson never disciplined him for his purported attendance and performance issues, and that if he was really exhibiting such problems, he should have been disciplined according to the terms of some unidentified disciplinary policy and given a chance to address those issues, rather than been laid off. Lamont fails to expand upon any of these reasons, and provides no documentation or discussion of the disciplinary policy to which he refers. The only policy included in support of the current motion is the collective bargaining agreement, which provides that a company may discharge an employee "for just and sufficient cause," so long as it issues a "no rehire slip" with the local union. (Lamont Depo. at pp. 206-07, Ex. 14, p. 4.) Lamont does not dispute that Anning-Johnson never issued such a slip. (Gauthier Decl. at ¶¶ 5, 15.) Thus, the court construes Lamont's argument to be that Anning-Johnson's reasons for laying him off were inconsistent and thereby give rise to a genuine issue of fact with respect to pretext.

However, nothing in the record indicates that Anning-Johnson's reasons for laying off Lamont were indeed inconsistent. The record is clear that Lamont was laid off primarily because of diminishing work on the Ladd Tower project, and that in selecting him for layoff, Anning-Johnson considered his performance and attendance issues relative to others. (*Id.* at ¶¶ 10-13.) Lamont testified that Gauthier routinely considered the relative performance of employees in deciding who would be laid off first as work diminished on a job, and that he himself had passed such information along to Gauthier when acting as taping foreman on job sites. (Lamont Depo. at pp. 26-37, 34.) Anning-Johnson has never claimed that Lamont is unable to perform his duties or that the problems reported at the Tanasbourne, Toke America, or Ladd Tower jobs were so serious as to warrant discipline. Both Gauthier and Philliber explained to Lamont at the time of

Page 20 - FINDINGS AND RECOMMENDATION

his layoff, that he had been laid off primarily because of diminishing work, and that his performance and attendance problems were the reason that he was selected. (Lamont Depo. at pp. 131-35; Gauthier Depo. at pp. 25-27; Gauthier Decl., at ¶ 16; Philliber Depo. at p. 19.) In responding to Lamont's request to be placed on Recinos' crew, Gauthier told him that he was not breaking up that crew because it was highly productive. (Lamont Depo. at pp. 131-32.) Even Lamont testified that Recinos' work crew was the "cream of the crop." (*Id*. at p. 113.) This lends further support to Anning-Johnson's argument that it considered Lamont's performance, rather than his age or race, in choosing to lay him off. Given the need to reduce the workforce at Ladd Tower, Anning-Johnson's consideration of Lamont's performance relative to others was not pretextual.

Lamont has not provided specific and substantial evidence sufficient to demonstrate that Anning-Johnson's reasons for laying him off in January 2009 were a pretext for race or age discrimination. Accordingly, he has failed to carry his burden under the *McDonnell Douglas* framework and Anning-Johnson should be granted summary judgment on these claims.

## II. Retaliation Claims

Lamont also alleges two claims for retaliatory discharge arising under Oregon statutes: (1) he was discharged in violation of O.R.S. 659A.030(1)(f), based on his complaint of age and race discrimination made to Flynn on January 16, 2009; and (2) he was discharged in violation of social policy under O.R.S. 654.062(5)(a), based on his safety related complaint made while working at the Toke America job site. Even though he brings claims under Oregon statutes, the required elements for a *prima facie* case are the same as those required for Title VII retaliation claims, and the same *McDonnell-Douglas* burden shifting approach applies. *See Payne v. Apollo*

Page 21 - FINDINGS AND RECOMMENDATION

*College-Portland, Inc.*, 327 F. Supp. 2d 1237, 1245 (D. Or. 2004) (applying Title VII elements to

state law claim for retaliation brought under O.R.S. 659A.030(1)(f)); *see also McCallum v. Boise*

*Cascade, LLC*, Civil No. 06-1834-ST, 2008 WL 4279810, at *15 (D. Or. September 12, 2008)

(applying Title VII elements to retaliation and wrongful discharge claims brought under O.R.S.

654.062).

### A. *Prima Facie* Case

To establish his *prima facie* case, Lamont must show that:  (1) he is a member of a

protected class or engaged in protected activity; (2) he suffered an adverse employment action;

and (3) a causal link exists between his status or activity and the employment action.  *See Trent*

*v. Valley Elec. Ass'n Inc.*, 41 F.3d 524, 526 (9th Cir. 1994).  For purposes of summary judgment,

Anning-Johnson takes issue only with the causation element of both claims.

"To show the requisite causal link, the plaintiff must present evidence sufficient to raise

the inference that [his] protected activity was the likely reason for the adverse action." *Cohen*,

686 F.2d at 796 (citations omitted).  "[A] *prima facie* case may be inferred from circumstantial

evidence, such as the employer's knowledge that the plaintiff engaged in protected activities and

the proximity in time between the protected action and the allegedly retaliatory [activity]."

*Yartzoff v. Thomas*, 809 F.2d 1371, 1376 (9th Cir. 1987).  The showing required to meet this

burden is minimal, but it is "[e]ssential to a causal link . . . that the employer was aware that the

plaintiff had engaged in the protected activity." *Cohen*, 686 F.2d at 796.

### 1. Age and Race Complaint

Anning-Johnson asserts that Lamont cannot establish causation for his complaint of age

and race discrimination because he engaged in the protected activity after he was laid off, and

therefore Anning-Johnson could not have been motivated by this activity in deciding to discharge him. Lamont admits that he made his first complaint of age and race discrimination on January 16, 2009, after he was informed of his layoff. (Amended Complaint at ¶¶ 4, 30.) Despite this crucial fact, Lamont appears to argue that while he may have been laid off initially, the layoff turned into a discharge when Philliber learned that he had made a race and age complaint to Flynn because after learning of his complaint, Philliber and Gauthier decided not to recall him from layoff status.[5] Even though Anning-Johnson has not issued a "no rehire" slip as required by the union in order to discharge an employee, Lamont asserts that he has not been contacted for available work, and thus, has been effectively discharged. In support, Lamont points to the fact that his company-issued cell phone was turned off immediately after Philliber and Roach spoke with him about the complaint he made to Flynn. While he acknowledges that only foremen are issued company cell phones and that he had been working in a journeyman role and therefore was not necessarily entitled to a phone, his phone had never been turned off during previous layoff periods when he was also performing journeyman work. (*Id.* at pp. 70, 152.) This course of events led Lamont to believe that he was discharged, not simply laid off, as of January 16, 2009. (*Id.* at pp. 152-54.)

Anning-Johnson vigorously disputes this interpretation of the course of events, presents evidence to support its position, and insists that Lamont has not suffered any adverse

---

[5] Here, the disagreement over whether Lamont was laid off or discharged becomes somewhat significant, though it still does not rise to the level of a material dispute. Anning-Johnson asserts that Lamont's argument that he has not been recalled from the layoff is a separate claim for "failure to recall," which he has not plead in the operative complaint and cannot do so now. However, the court reads Lamont's argument that he has not been recalled as part of his properly pled discharge claim and considers this part of the adverse employment action.

Page 23 - FINDINGS AND RECOMMENDATION

employment action since the voicemail on January 15, 2009 informing him of the layoff, and

thus, he cannot establish his *prima facie* case. However, viewing the facts in the light most

favorable to Lamont, and in light of the minimal burden necessary at this stage, Lamont has

presented evidence sufficient to raise the inference that his complaint was the likely reason that

he has not been called back for work. While this is hardly the only inference raised by the

evidence, Lamont has met his minimal burden in establishing a causal link between the protected

activity and the retaliatory action.

### 2. Safety Complaint

With regard to his claim for retaliation in violation of social policy for making a safety

complaint, Anning-Johnson asserts that Lamont cannot establish a causal link between his

complaint and his layoff because too much time elapsed between the protected activity and

allegedly retaliatory action. The Ninth Circuit has held that "when adverse employment

decisions are taken within a reasonable period of time after complaints of discrimination have

been made, retaliatory intent may be inferred." *Passantino v. Johnson & Johnson Consumer

Prods., Inc*, 212 F.3d 493, 507 (9th Cir. 2000) (citing cases).

Lamont asserts that he was removed from the Toke America job site for "making a stink"

about safety conditions, and that when he initially asked for the MSDS, his foreman told him that

he did not want to make trouble. Lamont asserts that because of this incident, Anning-Johnson

kept a closer watch on him after he was moved to the Ladd Tower job. Lamont's strongest

evidence to support this position is that while working at Ladd Tower, Hart reported to Gauthier

that Lamont left the job site early, even though, according to Lamont, he only did so when he had

received advance permission. (Lamont Depo. at pp. 121-22.) Adding further credence is

Page 24 - FINDINGS AND RECOMMENDATION

Lamont's assertion that Hart told him that the day before the layoff, Gauthier had noticed that

Lamont had left early, but Hart failed to mention that he had approved his request to leave early

that day. (*Id.* at pp. 126-28.)

The time between Lamont's October 9, 2008, safety complaint and his layoff in January

2009 is approximately three months. Viewing the facts in the light most favorable to Lamont and

keeping in mind that his burden in establishing a *prima facie* case is minimal, it is reasonable to

infer his safety complaint on the Toke America job motivated the alleged retaliatory action. *See*

*Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1065 (9th Cir. 2000) ("[C]ausation can be

inferred from timing alone where an adverse employment action follows on the heels of protected

activity."); *see also Coszalter v. City of Salem*, 320 F.3d 968, 977 (9th Cir. 2003) ("Depending

on the circumstances, three to eight months is easily within a time range that can support an

inference of retaliation."). Thus, Lamont has satisfied his minimal burden to establish his *prima*

*facie* case as to whether his layoff and Anning-Johnson's subsequent failure to recall was due to

his protected conduct.

### B. Employer Justification

Since Lamont has established a *prima facie* case, Anning-Johnson must articulate

legitimate non-retaliatory reasons for the adverse employment action. Anning-Johnson relies

upon the two justifications set forth above regarding Lamont's discrimination claim. First, that

as work diminished at the Ladd Tower, layoffs became necessary, and second, Lamont was

selected for layoff because of his poor performance and attendance relative to others. To the

extent that Lamont asserts that Anning-Johnson's failure to recall him was because of his

complaints, Anning-Johnson asserts that he has not been recalled because Lamont has not

contacted anyone at Anning-Johnson seeking work, there is of lack of work in the drywall

business due to the overall economic downturn, and several foreman have made requests that

Lamont not be assigned to their projects due to his problems with attendance and performance.

With regard to his safety complaint and removal from the Toke America job site, Anning-

Johnson specifically asserts that it removed Lamont from the job because of its concern with

maintaining a positive relationship with the general contractor, Anderson, with whom Lamont

had previously experienced problems.  These are all legitimate, non-retaliatory justifications for

the actions taken by Anning-Johnson.

### C. Pretext

Because Anning-Johnson has produced legitimate justifications for its actions, Lamont

must put forth specific and substantial evidence that Anning-Johnson's reasons are really a

pretext for taking retaliatory action against him.  Pretext may be established in one of two ways:

"(1) indirectly by showing that defendant's proffered explanation is 'unworthy of credence'

because it is internally inconsistent or otherwise not believable; or (2) directly, by showing that

unlawful discrimination more likely motivated the employer."  *Chuang,* 225 F.3d at 1127.

Viewing the cumulative evidence in the light most favorable to Lamont, the record

establishes that Anning-Johnson's explanations lack credibility.  Beginning with the Tanasbourne

job, Anning-Johnson began a pattern of reducing Lamont's responsibilities.  There is nothing in

the record to indicate that Lamont had any performance or attendance problems during the more

than three years that he worked for Anning-Johnson. (Lamont Depo. at pp. 15, 19-20, 46-47, 57-

60; Gauthier Decl. at ¶¶ 4, 6; Gauthier Depo. at p. 11)  Nonetheless, after his removal from the

Tanasbourne job, where he had been serving as foreman, his next job was as a journeyman at the

Page 26 - FINDINGS AND RECOMMENDATION

Toke America job site, from which he was also promptly dismissed after his safety complaint. (Lamont Depo. at pp.66-67, 72-85; Gauthier Depo. at p. 43; Philliber Depo. at p. 28.)  While Lamont lost no pay and was immediately reassigned to a series of other projects, he worked as foreman on only a few of those small jobs.  (*Id*. at pp. 67-69, 89-90; 115-16; Gauthier Decl. at ¶ 7.)  His next big assignment was at Ladd Tower as a journeyman.  (*Id*.)  While it was not necessarily unusual for a foreman to work as a journeyman when no foreman work was available, a reasonable fact finder could find the continued placement of Lamont in a journeyman role was in retaliation for engaging in protected activity.

The record also supports Lamont's assertion that his supervisors began keeping a close eye on him after he made his safety complaint.  While at Ladd Tower, taping foreman Hart periodically spoke with Gauthier about problems he was allegedly having with Lamont, including concerns about his attendance, ability to contribute to the team, and refusal to perform tasks essential to taping.  (Gauthier Decl. at ¶ 8; Hart Decl. at ¶¶ 6-7; Hart Depo. at pp. 34-35.) Gauthier himself would periodically tour the Ladd Tower site and observe that Lamont did not always appear to be in his assigned work area and reported this information to Philliber. (Gauthier Depo. at p. 36; Gauthier Decl. at ¶¶ 8-9.)  Finally, according to Lamont, Hart told him that Gauthier had come to the Ladd Tower work site the day before the layoff, asking  questions about where Lamont was, but that Hart failed to mention to Gauthier that he had approved Lamont's request to leave the site early that day.  (*Id*. at pp. 126-28.)  Lamont vigorously disputes Anning-Johnson's characterization of his attendance and work performance and points out that he was never disciplined or even told about these alleged concerns.  There is no evidence in the record that this type of checking in on or reporting about specific employees was standard

Page 27 - FINDINGS AND RECOMMENDATION

practice, thereby lending further credence to Lamont's claim that he was being singled out and retaliated against for engaging in protected behavior. A reasonable fact finder could conclude that after he made his safety complaint, Anning-Johnson had targeted Lamont for layoff and began watching him more closely.

Lamont's supervisors were not pleased when they learned of his complaints, lending further support for Lamont's claim that Anning-Johnson's reasons for laying him off or failing to recall him were indeed pretextual. Upon learning that Lamont was continuing to pursue his safety complaint, Gauthier expressed to Lamont that he was "kind of upset" that Lamont had sent the letter. (Lamont Depo. at. pp. 88-89, 93, 99-100.) Philliber made a similar phone call to Lamont after leaning that he had complained of age and race discrimination to Flynn. (Lamont Depo. at pp. 145; Philliber Depo. at pp. 15-18.) According to Lamont, during this phone call Philliber was "badgering" him about why he had called corporate. (Lamont Depo. at pp. 145-51.) Philliber characterizes this conversation as an attempt to "reason with" Lamont about the reason for his layoff. (Philliber Depo. at p. 19.) Regardless, a reasonable fact finder could conclude that Lamont's supervisors did not like it when he made complaints to others above them in the supervisory chain of command, and laid him off because of these complaints.

Within an hour of his conversation with Philliber, Lamont's company-issued cell phone was turned off, despite the fact that it had never been turned off before during a layoff. (Lamont Depo. at pp. 151-52.) Curiously, neither Philliber nor Gauthier can remember who directed that Lamont's phone be turned off, but both acknowledge that they had that ability. (Philliber Depo. at p. 23; Gauthier Depo. at p. 15-16.) Despite the fact that Gauthier had told Lamont that he thought the layoff would last at least a week, Gauthier testified that he thought that Lamont

would not return to work as a supervisor, and that if he did come back, it would be as a journeyman. (Lamont Depo. at p. 135, Gauthier Depo. at pp. 17-18.) Similarly, Philliber testified that he did not expect Lamont to come back as a foreman in the near future. ( Philliber Depo. at p. 24.) Even though Gauthier has had some taping work, he has not called Lamont, though he testified that he has called other foremen when work became available when he knew they were waiting for work. (Gauthier Depo. at pp. 21-21.) According to Lamont, he has not made any efforts to be recalled because he believed he had been fired and that because Gauthier still worked there, he would likely not be recalled. (Lamont Depo. at p. 158-59.) A reasonable fact finder could conclude that Anning-Johnson was tired of Lamont's complaints and had no intention of calling him back to work.

Lamont has provided specific and substantial evidence sufficient to demonstrate that Anning-Johnson's reasons for laying him off in January 2009 were for in retaliation for opposing unlawful employment practices in violation of O.R.S. 659A.030(1)(f) by complaining of age and race discrimination, or for violation of social policy, in violation of O.R.S. 654.062(5)(a) for complaining about safety at the Toke America job site. Accordingly, he has carried his burden and Anning-Johnson's motion for summary judgment on these claims should be denied.

## RECOMMENDATION

For the reasons set forth above, defendant's motion for summary judgment (#16) should be granted in part and denied in part.

## SCHEDULING ORDER

The Findings and Recommendation will be referred to a district judge. Objections, if any, are due fourteen (14) days from service of the Findings and Recommendation. If no objections

are filed, then the Findings and Recommendation will go under advisement on that date.

If objections are filed, then a response is due within fourteen (14) days after being served with a copy of the objections.  When the response is due or filed, whichever date is earlier, the Findings and Recommendation will go under advisement.

DATED this 24th day of January, 2011.

Paul Papak
United States Magistrate Judge

Page 30 - FINDINGS AND RECOMMENDATION